People v Prusinski (2025 NY Slip Op 05990)

People v Prusinski

2025 NY Slip Op 05990

Decided on October 30, 2025

Appellate Division, Third Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:October 30, 2025

113003 CR-24-1479
[*1]The People of the State of New York, Respondent,
v
Jordan Prusinski, Appellant.

Calendar Date:September 8, 2025

Before:Clark, J.P., Aarons, Lynch, Ceresia and Fisher, JJ.

Hug Law, PLLC, Albany (Matthew C. Hug of counsel), for appellant.
Lee C. Kindlon, District Attorney, Albany (Emily Schultz of counsel), for respondent.

Fisher, J.
Appeals (1) from a judgment of the Supreme Court (Roger McDonough, J.), rendered July 27, 2018 in Albany County, upon a verdict convicting defendant of the crime of attempted murder in the first degree, and (2) by permission, from an order of said court, entered July 14, 2021 in Albany County, which denied defendant's motion pursuant to CPL 440.10 to vacate the judgment of conviction, after a hearing.
In July 2017, defendant was charged by indictment with attempted murder in the first degree and attempted murder in the second degree in connection with a shooting earlier that month that caused nonfatal injuries to two individuals in the City of Albany. Defendant moved to suppress statements he made to law enforcement during a custodial interrogation following his arrest, which, after a hearing, was denied by Supreme Court. Following a jury trial, at which defendant pursued a justification defense, defendant was found guilty as charged. Prior to sentencing, defendant retained new counsel and moved, pursuant to County Law § 701, to disqualify the Albany County District Attorney's office on the grounds that his trial counsel had a business relationship with the prosecuting Assistant District Attorney (hereinafter ADA). Supreme Court denied such motion, and sentenced defendant to a prison term of 22 years to life.[FN1]
In September 2020, defendant moved under CPL article 440 to vacate the judgment of conviction, alleging that he received ineffective assistance of counsel by way of an actual and potential conflict of interest between his trial counsel and the ADA. Specifically, defendant contended that his trial counsel had an ongoing arrangement paying the ADA prosecuting defendant to draft appellate briefs for her other clients. Following a hearing, Supreme Court denied defendant's motion, finding that no actual conflict of interest existed and that trial counsel's undisclosed potential conflict of interest did not operate upon the defense. Defendant appeals from the judgment of conviction and, by permission, from the denial of his CPL article 440 motion.
We affirm. Defendant challenges the legal sufficiency and weight of the evidence supporting his conviction, specifically contending that the People failed to establish that defendant did not act in self-defense. Initially, although defendant made a motion for a trial order of dismissal at the close of the People's proof and renewed it "for the same reasons" at the close of his proof, such motion was only directed at the purported lack of evidence identifying him as the shooter — not based on the justification defense. Accordingly, defendant's legal sufficiency claim is unpreserved (see People v Montford, 207 AD3d 811, 811 [3d Dept 2022], lv denied 39 NY3d 941 [2022]; People v Ackerman, 173 AD3d 1346, 1348 [3d Dept 2019], lv denied 34 NY3d 949 [2019]). "Nevertheless, as part of this Court's weight of the evidence review, we necessarily determine whether the elements of the crimes were proven beyond a reasonable [*2]doubt and whether the justification defense was disproven" (People v Hernandez, 165 AD3d 1473, 1473 [3d Dept 2018] [internal quotation marks, brackets and citations omitted]; see People v Flynn, 233 AD3d 1087, 1088 [3d Dept 2024], lv denied 44 NY3d 982 [2025]). As relevant here, the justification defense permits an individual, unless he or she is the initial aggressor, to "use physical force upon another person when and to the extent he or she reasonably believes such to be necessary to defend himself, herself or a third person from what he or she reasonably believes to be the use or imminent use of unlawful physical force by such other person" (People v DeCamp, 211 AD3d 1121, 1122 [3d Dept 2022] [internal quotation marks and citations omitted], lv denied 39 NY3d 1077 [2023]; see Penal Law § 35.15 [1]). When a "defendant advances a justification defense regarding the use of deadly physical force, the People are obliged to demonstrate beyond a reasonable doubt that he [or she] did not believe deadly force was necessary or that a reasonable person in the same situation would not have perceived that deadly force was necessary" (People v Wilkins, 216 AD3d 1359, 1361 [3d Dept 2023] [internal quotation marks, ellipsis and citations omitted], lv denied 40 NY3d 1000 [2023]).
The trial testimony established that the victims were in a group of four men who went to a bar and nightclub on the night of the shooting. When they decided to leave, they exited the establishment and ended up sitting outside the bar to talk to a friend, before ultimately leaving to walk down the side street where they believed their vehicle was parked. According to one of the victims,[FN2] when his group got up to leave, he observed two other men who had been standing at the street corner — one who would later be identified as defendant — begin walking down the same street "some distance" in front of them. As both groups continued walking down the middle of the street in the same direction away from the bar, defendant went to the left side of the street and out of sight for approximately 10 seconds. He then rejoined the other man still walking in the middle of the street and about 13 to 15 feet in front of the victim's group. The victim testified that, about five seconds later, defendant turned around with an extended arm pointed in his direction and then began shooting at his group, hitting him and a friend. The victim further testified that his group was not mocking, "messing with" or pretending they had a gun before defendant turned around and starting shooting at them. After getting shot, the victims went to the hospital and ultimately gave statements to the police. Several members of law enforcement were called to testify, revealing that they recovered 11 spent casings/shells from the scene of the shooting and surveillance videos from the bar and residents along the street where the shooting occurred. According to investigators, the video footage did not capture the actual shooting[*3], but did depict both groups walking down the street, disappear off screen, and shortly thereafter the victims are again seen running away toward the bar.
Defendant testified as the sole witness for the defense and confirmed that he had been the shooter. He explained that his close friend had recently been stabbed to death in Albany, and that he was nervous being in the area. Defendant testified that his friend told him not to worry because he had a gun. He further testified that when he left the bar with his friend, he "brushed shoulders with somebody" outside the bar, who became agitated. Defendant said he tried to walk away and de-escalate the situation, but the man followed him and his friend across the street with two others who looked like they "wanted to do something to us right then and there." Defendant testified that the group made threats about stabbing in the neck other people who bumped them or that one of their other friends would "blow your head off." After the group left, defendant testified he went with his friend to sober up back inside the bar and to get pizza from a local business nearby. A little while later, defendant testified that he saw the victim's group come out of the bar and start talking to one of the individuals who confronted and threatened them. Defendant recognized one of the members of the victim's group as a local rapper, who frequently displayed guns in his music videos on social media and produced songs about "shooting people, and gang banging and stuff like that." Defendant testified that he saw one of the individuals nod in his direction, and that's when defendant and his friend decided to leave by walking down the street to where they parked the vehicle. According to defendant, the victim's group crossed the street and began to follow them down the middle of the street, call out to them, and make references to shooting a gun or robbing them. Defendant testified he was getting "really nervous" and afraid, and began to think about his friend who was murdered months earlier in Albany. Defendant explained that what happened next was "fast," but that he glanced over his shoulder and saw one of the men with a gun, then defendant's friend handed him a gun and he "just shot" at the victim's group. He then ran with his friend to their vehicle and drove away.
Based on the foregoing, a different verdict would not have been unreasonable in this case, as the victim's and defendant's testimony presented conflicting accounts of what occurred leading up to the shooting. Nevertheless, "when viewing the evidence in a neutral light and deferring to the jury's credibility determinations, we conclude that the verdict is not against the weight of the evidence" (People v DeCamp, 211 AD3d at 1123). Contrary to defendant's contention that he made genuine efforts to avoid conflict, by his own account he admitted to remaining in the area — even going back into the bar — after receiving threats of being stabbed in the neck or shot in [*4]the head. Although defendant testified that one of the victims had a gun when walking behind him, inferring that they were the initial aggressors, the police did not recover any firearm or find any evidence at the scene or on surveillance footage that any of the victims had a firearm. Rather, the police determined that defendant fired 11 shots without any return fire from the victims and then ran away. Despite testifying that he shot at the victims in self-defense, defendant admitted that he never called 911 and that he told detectives during his custodial interview that he had never fired a gun before when that was not true. Even though the victim's account also included inconsistencies that were brought out on cross-examination, the competing narratives presented the jury with a credibility determination (see People v Brooks, 233 AD3d 1358, 1361 [3d Dept 2024]; see also People v Lewis, 224 AD3d 1143, 1149 [3d Dept 2024], lv denied 42 NY3d 939 [2024]). Based on the other evidence presented at trial and deferring to the credibility determinations of the jury, we are satisfied the rejection of the justification defense was not against the weight of the evidence (see People v Wilkins, 216 AD3d at 1364; People v Cutting, 206 AD3d 1281, 1282 [3d Dept 2022]; see also People v Mercer, 221 AD3d 1259, 1263 [3d Dept 2023], lv denied 41 NY3d 1003 [3d Dept 2024]; People v DeCamp, 211 AD3d at 1124).
Next, defendant contends that Supreme Court erred by denying his request to suppress the video recording of his custodial interrogation following his arrest because he unequivocally invoked his right to counsel. We disagree. "A defendant's request for an attorney will invoke his or her indelible right to counsel if the request is unequivocal, an inquiry which is a mixed question of law and fact that must be determined with reference to the circumstances surrounding the request including the defendant's demeanor, manner of expression and the particular words found to have been used by the defendant" (People v Burton, 215 AD3d 1054, 1060 [3d Dept 2023] [internal quotation marks and citations omitted], lv denied 40 NY3d 927 [2023]). On a motion to suppress, a hearing court's credibility determinations are entitled to great weight, and will not be disturbed unless clearly erroneous (see People v Phillips, 46 AD3d 1021, 1022 [3d Dept 2007], lv denied 10 NY3d 815 [2008]). Here, defendant contends that he was handcuffed and then announced "I want to call my lawyer" as police officers were leading him out of his father's home. At the suppression hearing, defendant's father testified he heard his son make this request, but two detectives who were present during defendant's arrest testified that they did not hear him say that or make a similar statement. This presented a credibility determination for Supreme Court to resolve, and it credited the detectives' testimony by relying on the fact that defendant was brought to the police station following his arrest, read his Miranda [*5]rights at the start of the custodial interview, confirmed he understood his rights and then continued to speak with detectives for approximately 75 minutes before invoking his right to counsel. Based on our review of the hearing testimony and our observations from the custodial interview recording, we are satisfied that Supreme Court properly denied defendant's suppression motion (see People v High, 200 AD3d 1209, 1211 [3d Dept 2021], lv denied 37 NY3d 1161 [2022]; People v Dawson, 195 AD3d 1157, 1158-1159 [3d Dept 2021], affd 38 NY3d 1055 [2022]).
To this end, we reject defendant's contention that he was denied meaningful representation to the extent that his trial counsel allowed portions of the custodial interview recording to be played for the jury, "because counsel will not be found to be ineffective on the basis that he or she failed to make an argument or motion that has little or no chance of success" (People v Henley, 232 AD3d 1117, 1121 [3d Dept 2024] [internal quotation marks and citations omitted], lv denied 43 NY3d 930 [2025]). As for trial counsel's decision to consent to a missing witness charge against the defense, counsel indicated that, under the prevailing legal authority, she had no reasonable basis for opposing the People's request for the charge, and defendant has not demonstrated otherwise on appeal. Although defendant criticizes trial counsel for shifting the defense strategy from an identity defense to a justification defense, our review of the record reveals that the gravamen of trial counsel's opening statement was focused on self-defense and his reasonable fear from being in Albany. Trial counsel developed this theory during the trial by establishing that defendant's friend was recently murdered and demonstrating his awareness that members of the victim's group had access to firearms. Even though this strategy was ultimately not successful, our further review of the record demonstrates that counsel made decisions and objections consistent with this strategy (see People v Flynn, 233 AD3d at 1091-1092; People v Perulli, 217 AD3d 1133, 1137-1138 [3d Dept 2023], lv denied 40 NY3d 1081 [2023]), and further made cogent opening and closing statements, appropriate objections, obtained three missing witness charges and otherwise afforded meaningful representation to defendant (see People v Smith, 237 AD3d 1367, 1377 [3d Dept 2025], lv denied 43 NY3d 1059 [2025]; People v Contompasis, 236 AD3d 138, 153 [3d Dept 2025], lv denied 43 NY3d 1007 [2025]; People v Wilkins, 216 AD3d at 1364-1365).
To the further extent that defendant contends that he received the ineffective assistance of counsel based upon the undisclosed business relationship between his trial counsel and the prosecuting ADA, which was the basis of his CPL article 440 motion, we are satisfied that Supreme Court properly denied the same. Such business relationship between the same trial counsel and ADA has been the subject of several other appeals, wherein we have rejected [*6]the same arguments with respect to an actual conflict and potential conflict of interest (see People v Hines, 228 AD3d 995, 996-997 [3d Dept 2024], lv denied 42 NY3d 938 [2024]; People v Mero, 221 AD3d 1242, 1243 [3d Dept 2023], affd 43 NY3d 407 [2024]; People v Thomas, 217 AD3d 1125, 1127-1128 [3d Dept 2023], lv denied 40 NY3d 1013 [2023]). The Court of Appeals has also determined that this business relationship, where the ADA drafted a limited number of appeals and one motion for the trial counsel in counties other than the county of prosecution and without access to trial counsel's files, did not give rise to an actual conflict of interest (see People v Mero, 43 NY3d 407, 416 [2024]).
As to a potential conflict of interest, such conflict requires reversal "if a defendant shows that a potential conflict actually operated on the conduct of his [or her] defense" (id.). Thus, "[e]vidence that unconflicted counsel would have acted in a more vigorous, less inhibited manner may establish this point" (id. [internal quotation marks and citation omitted]). "Although a defendant need not make a showing of specific prejudice stemming from a potential conflict, he or she nevertheless bears a heavy burden of proof" (People v Thomas, 217 AD3d at 1127 [citations omitted]). Here, the affidavits and testimony adduced at the hearing failed to demonstrate that the potential conflict operated on the defense. Rather, it revealed that trial counsel secured a favorable plea offer despite compelling video and testimonial evidence establishing defendant as the shooter. Although trial counsel did not refute that she told defendant's mother that she would tell the ADA things that she would "never" say to other prosecutors, she clarified that this was in the context of a trusting relationship to get him to be "straight" with her regarding the People's position on the case — particularly given that defendant faced a maximum punishment of life in prison. Despite this close relationship, both trial counsel and the ADA consistently testified that they did not share confidential information with the other on defendant's case. Defendant produced no evidence to the contrary. Further based on our determination that trial counsel otherwise provided meaningful representation, and deferring to Supreme Court's superior position to observe the witnesses and make credibility determinations, we are satisfied that defendant's CPL article 440 motion was properly denied (see People v Hines, 228 AD3d at 997; People v Mero, 221 AD3d at 1252).
Lastly, we are unpersuaded by defendant's contentions that his sentence is unduly harsh or severe. Despite receiving 15 letters in support and acknowledging defendant's limited criminal history, Supreme Court was free to also consider the violent nature of defendant's conduct, which sent two people to the hospital — one with multiple gunshot wounds. In view of the serious and unprovoked nature of the instant offense, we perceive nothing unduly harsh or [*7]severe with the sentence imposed (see People v Diaz, 213 AD3d 979, 984 [3d Dept 2023], lv denied 40 NY3d 928 [2023]; People v DeCamp, 211 AD3d at 1124). Accordingly, we decline defendant's invitation to invoke our interest of justice jurisdiction to reduce his sentence (see People v Mercer, 221 AD3d at 1265). We have examined defendant's remaining contentions and have found them to be without merit.
Clark, J.P., Aarons, Lynch and Ceresia, JJ., concur.
ORDERED that the judgment and the order are affirmed.

Footnotes

Footnote 1: Supreme Court dismissed the charge of attempted murder in the second degree as being subsumed by the jury's verdict finding defendant guilty of attempted murder in the first degree.

Footnote 2: Only one of the victims testified from the group of four who were shot at.